## JENNINGS vs UNITED- STATES.

### Opinion Delivered October 26, 1899.

1. *Assault with Intent to Kill while Resisting Arrest—Undue Violence of Officers—Desperate Character of Defendant may be Shown.*

> In a trial for assault with intent to kill, while the defendant was resisting arrest, it is proper, to throw light on the conduct of the officers, whom the defendant claims were acting with undue violence, to show that the officers were in possession of information that the men they were seeking to arrest were desperadoes, charged with many crimes and roaming the country under assumed names.

2. *Knowledge of Official Character of Persons making Arrest—Instruction—Not Error to Refuse.*

> The court did not err in refusing to give an instruction, requested by defendant, the purport of which was that if defendant, at the time of the shooting, had no notice of the official char-

acter of the officers, he would have been justified in shooting at them, when the case was fully covered by another instruction to the same effect.

3. *Knowledge of Official Character—Right of Defendant to resist Arrest—Instruction.*

The evidence was overwhelming that defendant was fully informed of the official character of the persons attempting to arrest him. There is very little evidence to support the theory that defendant was not aware of the official character of the officers attempting to arrest him. *Held*, That the court did not err in refusing to instruct the jury as to his right to resist arrest, if he did not know the persons attempting to arrest him were officials, and had a warrant for his arrest.

4. *Self Defense—Defendant not entitled to Instruction as To.*

Under the evidence of this case the defendant was not entitled to an instruction, as to self defense, to the effect that the circumstances as to the danger he was in should be judged by the jury, as the circumstances appeared to him at the time.

5. *Assault with Intent to Kill—Not necessary that Defendant intended to kill any particular Person.*

When a person shoots into a body of men, indiscriminately, with the intention of killing one of them, not knowing nor caring which, it is an assault with intent to kill upon each and all, and it is not a defense to the indictment that the defendant had not selected any one in particular to kill.

6. *Assault with Intent to Kill—Not necessary to allege Malice Aforethought.*

Section 2142 Rev. St. U. S., and not § 1567 Mansf. Dig., is in force in the Indian Territory, and in a prosecution for assault with intent to kill, it is not necessary to allege and prove malice aforethought.

7. *Wrongful Instruction in Defendant's Favor—Not Error.*

The indictment charged defendant with assault with intent to kill with malice aforethought, and the court instructed the jury that the proof must show that the act was done with malice aforethought. *Held*, That this was error in the defendant's favor, of which he could not complain.

Appeal from the United States Court for the Northern District.

W. M. SPRINGER, Judge.

Al Jennings was convicted. of an assault with intent to kill, and appealed.    Affirmed.

At the May, 1898, term of the United States court for the Northern district of the Indian Territory, sitting at Muskogee, the defendant, Al Jennings, was tried and convicted on a charge of assault with intent to kill, upon the person of one James Franklin Ledbetter.    Ledbetter was a United States deputy marshal, in whose hands there had been placed a warrant for the arrest of the defendant, and three other persons, names unknown, upon a charge of assault with intent to kill.    After considerable searching and inquiry, the defendant, his brother, Frank Jennings, and two other men by the name of O'Malley were located at the house of a Mrs. Harless.    The deputy marshal, learning that the defendant and the others with him were desperate and lawless men, had taken with him a posse of five or six men to assist in making the arrest.    With Ledbetter was another deputy marshal, by the name of Paden Tolbert, who had in his possession a warrant for the arrest of the defendant and his brother, Frank Jennings, upon a charge of robbing the post office at Foyil, Ind. T.    One other of the party was also a deputy marshal.    Just before daylight they surrounded the house, locating themselves at different points around it.    About daylight the deputy and his posse found one of the O'Malley boys in a wagon, captured him, and took him to a barn near by.    Shortly afterwards one Clarence Enscoe, a brother of Mrs. Harless, came out for a bucket of water.    They captured him, and took him also to the barn.    Enscoe informed the deputy that the defendant and the other O'Malley boy were in the house.    Mrs. Har-

less next came out, and was also taken in charge. She was told by the deputy who he and those with him were, their official capacity, and that they had a warrant for the defendant, and for her to go to the house, tell the defendant those facts, and for him to come out and give up. They also told her that, if they refused to come out and give up, she and her family must leave the house. Ledbetter then took his station at an outside chimney of an outhouse, and the woman went to the house. Up to this time those who were left in the house were unaware of the presence of the marshal's force. After being in the house for a short time, two women and a boy left, as they had been directed to do in the event of defendant's refusal to surrender, and the marshals observed some demonstrations in the house, as if preparations were being made for resistance, and a shot was fired by one of them at the house. This was responded to, and a general battle ensued, in which from 60 to 100 sho's were fired, some of the shots from the house striking the chimney where Ledbetter had stationed himself. Some of the parties in the house were wounded. They finally, however, left the house, and made their escape. After the shooting was over, Mrs. Harless was seen, and stated to the deputies that when she went into the house she told the parties there that which she had been directed to tell, and one of them wanted to surrender, but the little red-readed one (the defendant) said, "No, he would die first," and that they then went upstairs and got their Winchesters. The defendant was afterward arrested, indicted, tried for an assault with intent to kill Ledbetter, convicted, and sentenced to five years' imprisonment. Numerous exceptions were taken at the trial, both to the admissibility of the evidence and to the charge of the court. Motion for new trial was filed, overruled, exceptions saved, and the case regularly appealed to this court.

(43)

*Thos. Marcum, De Roos Bailey,* and *Thomas Owen,* for appellant.

*P. L. Soper,* U. S. Atty.

CLAYTON, J. There are 15 assignments of error. They are as follows:

"(1) Because the court permitted the government witness J. F. Ledbetter to testify, over the objection of appellant, as follows: 'I believe it was the 4th of September —might have been the latter part of August, I forget the day now—I made a trip of two or three days after them. I went out east 25 or 30 miles. I went out east of Checotah, near Campbell Russell's place. I afterwards learned that they had been on the Pittsburg & Gulf, at Barren Fork, a station on the Pittsburg & Gulf. Well, I hunted around there on that information two, three, or four days. I next got information that they were in the Concharty Mountains. That was about the last of September. I was out there four, five, or six days,—I don't remember the exact number of days,—but I returned here on the 2d of October. When I got back, I noticed in the papers that they had held up the train at Chickasha. The evening I got back I noticed it in the papers. The next information I got of them was at a blacksmith shop about 8 miles north of Tulsa. I learned, however, that they were coming into the neighborhood of Claremore.'

"(2) Because the court permitted witness J. F. Ledbetter to testify over the objection of appellant, as follows: 'Q. Mr. Ledbetter, prior to December 1, 1897, when you went to the Harless ranch for the purpose of arresting Al Jennings and these other boys, please state whether or not you had any information at that time that Al Jennings had committed any other felony for which you desired to arrest him. A. Yes, sir.'

"(3) Because the court permitted the witness J. F. Ledbetter, over the objection of appellant, to testify as follows: 'Mr. Soper: Q. Mr. Ledbetter, since the time that you and Mr. Tolbert had been in pursuit of Al Jennings and the other parties,—since some time in July, I believe you stated,—state whether or not you had received any information which had come to you by which you knew at the time that Al Jennings had been going about in the Northern district of the Indian Territory under an assumed name. A. Yes, sir; I had received information that he and his brother were under an assumed name.'

"(4) Because the court permitted witness J. F. Ledbetter, over the objection of appellant, to testify as follows: 'Mr. Soper: Q. You have stated that you were in pursuit of this man for some time in July. During this pursuit, what was the result of your inquiries as to how long the defendant and the other boys with him remained at any place after you had received word that they were located there? A. I never did get information of their staying at one place over three or four days at a time, and that was at the mouth of the Little Spavinaw.'

"(5) Because the court permitted the government, over the objection of appellant, to read in evidence the warrant issued by Commissioner Robert L. McClure, dated November 24, 1897, after the one issued by Commissioner W. C. Jackson had been introduced.

"(6) Because the court refused to instruct the jury as requested by appellant in instruction No. 1, which is as follows: 'The court instructs the jury that if the defendant, being placed in a position in which his life is imperiled, shoot at an offcer of whose official character he has no notice, he would be justifiable if the shooting was apparently necessary to save his own life or to prevent his receiving great bodily harm; nor does it matter that the officer and

his posse were legally seeking to arrest him, if the defendant had no notice of that fact.'

"(7) Because the court refused to instruct the jury as requested by appellant in instruction No. 2, which is as follows: 'The court instructs .the jury that if they believe from the evidence in this case that an officer and posse brought on the difficulty by shooting at the defendant or those with him, or into the house where they were, and that the defendant believed, or had reasonable ground to believe, that he was in danger of losing his life or of receiving great bodily harm from such parties, and that he returned the firing, acting under this apprehension, you will acquit him, provided he had no notice of the official character of said parties, and of their right and purpose to arrest defendant.'

"(8) Because the court refused to instruct the jury as requested by appellant in instruction No. 3, which is as follows: 'The court instructs the jury that the motive of the defendant in being where he was at the time of the difficulty has nothing to do with the question of his right of self-defense, and that the lawfulness or unlawfulness of his previous conduct has nothing to do with the question of his right of self-defense, and it is to be considered only in so far as it may throw light on his belief that his arrest was sought by an officer.'

"(9) Because the court refused to instruct the jury as requested by appellant in instruction No. 4, as follows: 'The court instructs the jury that although they may believe from the evidence that, at the time of the alleged assault by the defendant, the officer and his posse had legal authority to arrest him, and that they attempted to exercise this power in such a violent and menacing manner as to threaten death or great bodily harm to said defendant, that this would justify him in shooting at said parties, if at the time he believed, and had reasonable grounds to believe, that he

was in danger of death or of receiving great bodily harm from said parties, and acted under this belief; and they are instructed that this is the law, notwithstanding that they may believe that the defendant at the time knew, that said parties were seeking to arrest him, and that they had the authority to do so.'

"(10) Because the court refused to instruct the jury as requested by appellant in instruction No. 5, which is as follows: 'The court instructs the jury that, in judging of the danger to the defendant at the time of the alleged shooting, the circumstances must be viewed as they appeared to him; and if they have a reasonable doubt, after a full and fair consideration of all of the evidence in the case, as to whether he was justifiable or not, they will acquit him.'

"(11) Because the court refused to instruct the jury as requested by appellant in instruction No. 6, which is as follows: 'The court instructs the jury that although they may believe defendant did not shoot in his necessary self-defense, that, before they would be authorized to convict him of assault with intent to kill, it must appear from the evidence that he fired at James Franklin Ledbetter, the party named in the indictment, with the specific intent to take the life of him, the said James Franklin Ledbetter, and that it is not sufficient to authorize a conviction that he may have fired at some one else with said Ledbetter.'

"(12) Because the court refused to instruct the jury as requested by appellant in instruction No. 7, which is as follows: 'Counsel for defendant asks the court to charge the jury that although they may believe from the evidence that defendant knew of the official character of Deputy Marshal Ledbetter and others with him at the time of the alleged assault, and knew of their purpose to arrest the defendant, yet if before defendant made any resistance to the arrest, and before defendant had time, with safety to his life, to surren-

der, the said Ledbetter and Paden Tolbert fired their guns at defendant in such a manner as to endanger his life or subject him to great bodily harm, and defendant saw or had no apparent means of saving his own life, or to prevent great bodily harm to himself, except to return the fire, then he would not be guilty of the crime charged, and the jury should acquit.'

"(13) Because the court instructed the jury as follows: 'Express malice is that deliberate intention of the mind unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, or where all the circumstances of the killing manifest an abandoned or wicked disposition. As it is impossible to fathom the depths of the mind, and explore the hidden recesses of the heart, so as to ascertain, by positive proof, that malice existed in the person charged with crime, the law has provided that malice may be implied where the circumstances of the killing show an abandoned and malignant disposition, or, as expressed in other parts of the law, where all the circumstances of the killing evince a heart regardless of social duty and fatally bent on mischief. The malice, in order to be established in this case, need not be of long existence  It need not have existed for any particular time. It is sufficient if it existed at the time of the effort, if made by the defendant, to kill the party named in the indictment. Malice will be implied where the killing is from any purpose of hatred, ill will, or from any corrupt motive, or from any unlawful motive. Hence, if you find that an attempt to kill, as charged in the indictment, was made with such unlawful purpose, or with any unlawful or corrupt motive, malice may be implied. The law implies malice where no considerable provocation appears, and where the killing manifests an abandoned and wicked disposition. The use of a deadly weapon by a person not justified in doing so, or in committ-

ing or engaged in an unlawful business or transaction, implies malice, and the law ho'ds a person responsible, who is himself committing an unlawful act, for the consequences of his act: and in such case as this, if you believe that the defendant was unlawfully resisting arrest, and using a deadly weapon for that purpose, the law would presume that he was using said deadly weapon with intent to kill and with malice aforethought.'

"(14) Because the court instructed the jury as follows: 'The court further instructs the jury that if you believe from all the evidence in this case, and from all the facts and circumstances that have been brought to your knowledge by the testimony of the witnesses, that the defendant in this case had knowledge of the official character of the persons endeavoring to make the arrest, or that he had notice of such official character, then, and in that event, the defendant would not be justified in making a resistance, and, if you believe that such facts have been established in this case, the defendant would not be justified in shooting at the prosecuting witness in this case.'

"(15) Because the court instructed the jury as follows: 'The court instructs the jury that if you believe from the evidence that the defendant was generally known as a dangerous criminal and outlaw; that he was a fugitive from justice, evading arrest; that he knew there was a warrant for his arrest in the hands of the proper officers of the law; and if you further believe from the evidence that the defendant, with other alleged dangerous criminals and outlaws, sought refuge in the house of one Harless, whose house was used as a refuge by defendant and his companions; and if you further believe from the evidence that Mr. Ledbetter and the other deputy marshals, having in their possession a legal warrant or warrants for the arrest of the defendant and his alleged outlaw companions, surrounded said

house, and sent word to the defendant and his companions that said marshals had warrants for their arrest, and a demand that they come out of the house and surrender, and that such word was taken to the defendant, and that, instead of surrendering, the defendant and his companions, armed with Winchester rifles, appeared at the window in a menacing manner,—then and in that case, if you further believe from the evidence that Mr. Ledbetter and the other deputy marshals honestly believed, and that the facts, appearance, and circumstances at the time were such as to lead a reasonable and prudent man, similarly situated, to believe, that it was absolutely necessary to fire on said defendant and his associates in order to effect his and their arrest, such firing by said marshals was justifiable, and under the law furnishes the defendant neither lawful excuse nor justification for firing upon said Ledbetter and the other deputy marshals, but such firing upon said deputy marshals was unlawful.' "

The first five specifications of error may be considered together. Most of the exceptions taken at the trial were general, and failed to point out the specific grounds of error as afterwards claimed in the brief of defendant, but, considering them from every standpoint, we think, under the circumstances of this case, the evidence was not improperly admitted. Of course, if this were an effort on the part of the government to unfavorably affect the defendant's case by showing that he had been guilty of other offenses, or that he had been charged with other crimes, it would be highly objectionable. But this was not the object. The purpose was to throw light on the conduct of the officers; to show that they were in possession, not only of the warrants, but of such information as would induce them, as prudent men, looking after their own safety, as well as to accomplish the arrest, to act as they did in their attempt to make the arrest; and to show the full authority under which they acted, and

to give the full reasons for their conduct. If they were informed that these men were desperadoes, charged with many crimes, and roaming the country under assumed names, their conduct would be quite different from that of making ordinary arrests. The defendant was claiming that the marshals and posse were the aggressors; that they acted hastily and imprudently; that they were making the arrest in a violent and unwarranted manner, giving him the right to stand on his defense. It is true this might be used as a two-edged sword, tending to show that the marshals' force, being in possession of this information, whether true or false, were thereby induced to act with undue haste and violence; but, be this as it may, the proof tended to throw light on the very transaction in controversy, by showing the true conditions under which the marshals acted, and that which induced them so to act, leaving the jury to determine whether, under these circumstances, together with the others in proof, the defendant was justified in resisting the arrest. It will be observed that no effort was made to show these other charges to be true; they were merely mentioned for the purposes above indicated.

The sixth, seventh, and eighth specifications of error are that the court erred in refusing to give three instructions asked for by defendant, all of which are of the import that if the defendant, at the time of the shooting, had no notice of the official character of the officers, he would have been justified in shooting at them. The third instruction given by the court fully and fairly covers this phase of the case. It is as follows: "(3) The court further instructs the jury that, in order to find the defendant guilty in this case, it must be shown to your satisfaction, beyond a reasonable doubt, that he had knowledge, or was informed, or was chargeable with notice, of the official character or mission of the parties endeavoring to make the arrest." This instruction was a clear and simple statement of the law, as favor_

Instructions as to character of person making arrest.

able to the defendant and as easily comprehended as those which the court refused, and therefore the court did not err in this respect.

The ninth and twelfth specifications of error are that the court erred in refusing to give two instructions asked for by defendant, to the effect that, although the defendant might have had knowledge of the official character of the officers, yet, if the arrest was made in such a violent and unwarrantably aggressive manner as to unlawfully place the life of the defendant in danger, he would have the right to resist and protect himself, even to taking the life of the officer, if necessary. As an abstract proposition of law, this is undoubtedly correct, and, if applicable to the case as made by the proof, should have been given. The court unquestionably refused to give it on the ground that the proof was so overwhelmingly strong that the defendant and his party were resisting arrest, and not defending their lives or persons against an unlawful arrest, as to render the instruction inapplicable. It becomes, therefore, necessary to examine the proof, to discover if there were any sufficient evidence to sustain such an instruction.

The proof shows that the defendant had been charged with many crimes. The marshals had two warrants against him, one for an assault with intent to kill, and the other for robbing a post office. The defendant testified that there was a charge pending against him in Oklahoma for the robbing of a train, and that the newspapers were full of charges as to other train robberies, and that there were heavy rewards being offered for his apprehension. He and the others were traveling under assumed names, and heavily armed with revolvers and Winchester guns. The marshals had been searching for them and trailing them over the country for many days, when finally they located them at the house of Mrs. Harless, to which place

they came on the evening preceding the fight, as it is called, the officers arriving at the place some time in the night. The next morning, Mrs. Harless, not knowing that the officers were about the premises, came out to where they were. She was then told the mission of these men; that they were officers, armed with process for the arrest of defendant and those with him; that she must go to the house, and inform them of their official character and purpose, —to tell the men to come out and give up; that, if they refused to do so, she and the family must leave the house. The woman at once returned. Although her own testimony is somewhat conflicting on the point, she evidently gave them the information. Immediately after the shooting she told the officers—at least, three of them testify to it—that she did inform them of the fact, and that one of them wanted to surrender, but the "red-headed one" (the defendant) said, "No; he would die first;" and they then immediately went upstairs, and got their Winchesters; thereupon she and another woman in the house and the boy left, as they had been told to do by the officers, in case they refused to surrender. During the night preceding the attempted arrest a man by the name of Kelley went to the house. As soon as he was heard at the door, every man of them sprung to his gun. It is true that the defendant attempted to explain this by saying that their object was to prevent the guns from being seen, but why they did not want them seen is not explained. As against this, Mrs. Harless, after admitting that the officers had told her of their official capacity, and what they were there for, says that when she went to the house she said to the defendant's party: "Boys, you are surrounded. Dobson and a whole lot of men are down there, and if you don't get out of here we will all get killed." The defendant states that she said, "Boys, you are all surrounded, and they are going to kill you all." He claims that he did not know who they were, but supposed that "it was a crowd of citizens trying

to capture them for the reward; that they had been told by friends at El Reno that they were going to be captured for the reward there was in it." The evidence in the case was overwhelmingly strong in support of the theory that these men, charged with numerous crimes, and armed and banded together, were bidding defiance to the law and its officers, and that they were fully informed of their official capacity and purpose and had full opportunity given them to obey the command of the law by submitting to a legal arrest; and the evidence to support the theory that they were not aware of the official character of these officers, and that a fair opportunity was not given them to surrender, and that they were defending themselves against an arrest being so improperly and violently made as to justify them in resisting, is so shadowy and uncertain as, in our opinion, not to render the refusal of the court to give the instruction under consideration reversible error, and the fourteenth and fifteenth instructions of the court were properly given.

As to the tenth specification of error, while it is true that in a case of self-defense, when the danger is only apparent, and not real, the appearances of danger must be viewed from the defendant's standpoint, yet we think that such an instruction is not applicable to this case. If the defendant and his party were acting at all in their necessary self-defense, it was only because of the fact that they had no notice, or the circumstances were such that they would not be held to have had notice, of the official character of the officers, and of their purpose to make the arrest; and the third instruction of the court fully covered that proposition, and fairly presented the question to the jury.

As to the eleventh specification of error, we are of the opinion that the court did not err in refusing to give the sixth instruction asked for by defendant. It asks the court to instruct the jury that there must have been a specific

*Self defense. Arrest by officers.*

intention on the part of the defendant to have killed Ledbetter, and that, if some one else of the crowd was fired at, this would not be sufficient. As applied to the facts of this case, this is not the law. The firing into a body of men indiscriminately, with the intention of killing one, not knowing or caring which, is an assault with intent to kill upon each and all. In such a case, the specific intention to kill is present, and the intention to kill whoever may be reached by the missile includes all or any who may be present. To him each is a common foe, the one is as much the object of his malicious intent as the other, and in such a case it is no defense to the indictment that the defendant had not selected any particular one to kill. "Recklessly shooting into a crowd is an assault, and an assault on several indiscriminately is an assault on each individual." 1 Whart. Cr. Law, 608.

The thirteenth specification raises an objection to the first instruction given by the court, in which the court instructs the jury upon the question of malice. The indictment alleges that the assault was made by the defendant upon Ledbetter, "with the intent him, the said James Franklin Ledbetter, then and there feloniously, wilfully, and of his malice aforethought to kill," etc. The court charged the jury that, "in order to constitute an assault with intent to murder, it must appear from the evidence in the case that, if the person assaulted had been killed, the killing would have been murder"; and then proceeded to define the crime of murder, giving the usual charge upon malice aforethought. Whether malice aforethought must be alleged and proven in a case of assault with intent to kill depends entirely upon the fact as to whether section 2142, Rev. St. U. S., or section 1567, Mansf. Dig. (section 910, Ind. T. Ann. St. 1899), is in force in this jurisdiction. The above section of the United States statute provides: "Every white person who shall make an assault upon an Indian, or

*(margin note:)* Assault. Indiscriminate firing.

other person, and every Indian who shall make an assault upon a white person, within the Indian country, with a gun, rifle, sword, pistol, knife, or any other deadly weapon, with intent to kill or maim the person so assaulted, shall be punishable by imprisonment at hard labor for not more than five years nor less than one year." Section 1567, Mansf. Dig. (section 910, Ind. T. Ann. St. 1899), provides: "Whoever shall feloniously, wilfully and with malice aforethought assault any person, with intent to murder or kill, or shall administer or attempt to give any poison or potion, with attempt to kill or murder, and their counselors, aiders and abettors, shall, on conviction thereof, be imprisoned in the penitentiary not less than three nor more than twenty-one years." Under the United States statute, any unlawful assault with a deadly weapon, with an intent to kill, whether done with malice aforethought or not, constitutes the offense. The circumstances of the assault may be such that, if death should result, it would be manslaughter; yet a deadly weapon being used, the intent to kill being proven, and the assault being unlawful, the offense is complete. But under section 1567, Mansf. Dig. (section 910, Ind. T. Ann. St. 1899), the element of malice aforethought must exist, because the statute so provides. The question then is, which is in force here? By section 34 of the act of congress approved May 2, 1890, it is provided that "original jurisdiction is hereby conferred upon the United States court in the Indian Territory to enforce the provisions of title twenty-eight, chapters three and four of the Revised Statutes of the United States, except the offenses defined and embraced in sections twenty-one hundred and forty-two and twenty-one hundred and forty-three." Section 2142 is the one relating to assaults with intent to kill, and, as the statutes of Arkansas had not at that time been extended over the Indian Territory, our courts were without any jurisdiction to try this class of cases, that jurisdiction at that

time being vested in the United States district courts at Ft. Smith, Ark., and Paris, Tex. It was by the act of March 1, 1895, that these courts for the first time acquired this jurisdiction. By that act, among other things, it is provided that "the provisions of chapter forty-five, of Mansfield's Digest of the General Laws of Arkansas, entitled 'Criminal Law,' except as to crimes and misdemeanors mentioned in the proviso of this section, be and they are hereby extended to and put in force in the Indian Territory: provided, that in all cases where the laws of the United States and the said criminal laws of Arkansas have provided for the punishment of the same offenses, the laws of the United States shall govern as to said offenses." Section 2142 of the Revised Statutes of the United States was a law of the United States in force here at that time, and it provided a punishment for the offense named in section 1567, Mansf. Dig. ' (section 910, Ind. T. Ann. St. 1899), and therefore it prevails. It is true that the two statutes are different in this: that one requires malice aforethought to be alleged and proven, while the other does not; but while the Arkansas statute, under this section, does not undertake to punish the lower grade of the offense,— that in which malice is wanting,—the federal statute is broad enough to include every grade, and therefore includes the higher grade and provides a punishment for it. The Arkansas statute limits the punishment to cases where malice appears; the law of the United States takes away all limitations, and punishes, whether there be malice or not, and therefore, "provides a punishment" for all cases of assault with intent to kill, and, by the very terms of the proviso of the act of March 1, 1895, governs in this jurisdiction. It was therefore not necessary in this case either to allege or prove malice on the part of the defendant. But it was alleged in the indictment, and the defendant went to trial upon it without objection. As malice was alleged, the court, following

Assault with
intent to kill.
Statute gov-
erning.

the allegation of the indictment, instructed the jury that, before they could convict, they must find that the defendant did the act with "malice aforethought," and defined it. But, however prejudicial this may have been to the government, we fail to comprehend how it could in any wise prejudicially affect the defendant's case. That the government was required by the court to prove the very highest grade of the offense, when, under the law, the defendant could have been convicted of a lower grade if it had been proven, was highly beneficial to him, and therefore he cannot be heard to complain. Let the judgment of the lower court be affirmed.

*Instruction not prejudicial.*

THOMAS and TOWNSEND, JJ., concur.